```
                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
                      HAMMOND DIVISION

LORETTA MACKERL,                  )
                                  )
          Plaintiff               )
                                  )
     v.                           )  Case No. 2:03 cv 537
                                  )
JO ANNE B. BARNHART,              )
COMMISSIONER OF SOCIAL SECURITY   )
                                  )
          Defendant               )
```

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the plaintiff, Loretta Mackerl, on December 22, 2003.  For the reasons set forth below, the motion is **DENIED**.

Background

The plaintiff, Loretta Mackerl, applied for Disability Insurance Benefits and Supplemental Security Income on November 30, 2001, alleging disability since August 13, 2001.  (Tr. 93-95) The Social Security Administration ("SSA") initially denied her application on March 15, 2002 and again upon reconsideration on August 19, 2002.  (Tr. 70, 76) Mackerl requested a hearing before an Administrative Law Judge ("ALJ") on August 23, 2002, and a hearing was held on April 25, 2003 before ALJ William J. Wilkin. (Tr. 21, 79) Subsequent to the hearing in which Mackerl and Vocational Expert ("VE") Michelle Peters testified, ALJ Wilkin denied Mackerl's application by written decision dated July 3, 2003.  (Tr. 13-20) Mackerl requested a review of ALJ Wilkin's decision by the Appeals Council on July 24, 2003. (Tr. 9) Following a denial of her request for review by the Appeals Council on

October 24, 2003, Mackerl filed a complaint in this court on March 8, 2004.  (Tr. 5-7)

   Mackerl was born on March 8, 1960 in East Chicago, Indiana, and is now 45 years old.  (Tr. 30) She was divorced and living in Gary, Indiana with her three children at the time of the ALJ hearing.  (Tr. 30-31) She has a high school education.  (Tr. 32) From 1984 to 1994 Mackerl was a cook in a rib restaurant, which required her to lift up to 50 pounds.  (Tr. 33-35, 113) From 1994 to 1996, Mackerl worked at a gas station, where she ran the cash register and lottery machine, carried in bottles and boxes, and lifted less than 10 pounds.  (Tr. 35-36, 113, 115) Mackerl's last job was as "first cook" at a riverboat casino from August 1996 to August 2001, where she was responsible for supervising the saute, grill, and salad line.  (Tr. 36-37, 113) This job required Mackerl to lift between 25 and 40 pounds.  (Tr. 37)

   On March 13, 2000, Mackerl suffered several facial fractures, a subdural hematoma, multiple scalp lacerations, and a laceration to the left ear when she was attached with a hammer by her ex-husband.  (Tr. 140, 161-62) She remained in the hospital for four days, during which time Dr. A. Sreeram surgically repaired her fractures.  (Tr. 133, 140-43) Mackerl tolerated the surgery well and was released by emergency room physician Dr. Bayne Spotwood on March 18, 2000.  (Tr. 134) On April 6, 2000, Dr. Spotwood noted that Mackerl denied feelings of disequilibrium and lightheadedness when she had the sutures removed from her head and left ear.  On April 21, 2000, Dr. Spotwood ordered a

2

second CT scan in order to measure Mackerl's progress from a CT scan conducted while she was in the hospital. (Tr. 131) The second scan showed a resolution of her subdural hematoma and did not reveal any acute hemorrhage, infarct or mass effect, or enhancing lesion. (Tr. 131) However, the CT also showed an increased opacification in the left maxillary sinus. (Tr. 131)

Mackerl returned to work as a cook in June 2000 but continued under the care of Dr. Spotwood. (Tr. 38, 172, 188) She reported that she was feeling dizzy and lightheaded in November 2000 and on another illegibly dated physician's note, where she reported that these symptoms occurred primarily in the mornings and when she was cooking. (Tr. 185-86) On July 25, 2001, Mackerl complained of a headache above her left eye. (Tr. 183) On August 13, 2001, Mackerl stopped working because she could not keep her balance. (Tr. 39)

On August 17, 2001, Mackerl saw Dr. Stephen Pirtle because she had felt lightheaded, weak, and fatigued for two weeks, although she no longer was experiencing headaches. (Tr. 183) She also was unable to walk heel to toe and had a shuffling gait. (Tr. 183) Dr. Pirtle ordered a CT scan, which showed no intracranial hemorrhage, infarct or mass effect, but total opacification of the left sinus, probably due to chronic sinusitis. (Tr. 173-74, 203) This CT scan showed no interval change from the CT scan from April 21, 2000. (Tr. 174) Nevertheless, on August 20, 2001, Mackerl again reported dizziness, a loss of balance, and weakness, although she was able to perform a heel to toe test.

3

(Tr. 202) On August 24, 2001, Dr. Spotwood completed a physician's statement for Mackerl's employer reporting that she was disabled by sinusitis from August 16, 2001 until August 27, 2001. (Tr. 171) Mackerl did not return to work.  (Tr. 172, 191)

On September 5, 2001, Mackerl's balance was "much improved," and she was able to walk heel to toe well, although her gait was slightly off-balance.  (Tr. 182) An MRI of Mackerl's brain on October 16, 2001 showed no definite abnormalities beyond evidence of chronic sinusitis.  (Tr. 170) On October 26, 2001, Mackerl reported improved balance and lessened sinusitis.  (Tr. 181)

On February 18, 2002, Dr. M. Zeitoun examined Mackerl in connection with her application for disability benefits.  (Tr. 191-92) Dr. Zeitoun observed that Mackerl had "a normal gait and was able to get on and off the exam table.  Able to walk on toes and heels.  Able to fully squat.  Has full range of motion in all joints."  (Tr. 192) Dr. Zeitoun also found that Mackerl's muscle and grip strength was 5/5, that her deep tendon reflexes were 2/4, and that she was able to button, zip, and pick up coins. (Tr. 192) On February 27, 2002, Mackerl reported to Dr. Pirtle that she had filed for disability benefits and that she continued to have problems balancing, although the problem was improving. (Tr. 201) On March 12, 2002, Dr. Gange, an agency doctor, reported that Mackerl had "no medically determinable impairment." (Tr. 194) In a request for medical advice dated July 31, 2002, Disability Specialist John Casiello concluded that "even with loss of balance, it appears claimant could perform some work."

4

(Tr. 198) However, on September 30, 2002, Dr. Spotwood's office notes state that Mackerl complained of feeling dizzy, weak, and lightheaded when bending over or getting up for at least two weeks. (Tr. 202)

On October 22, 2002, Dr. Daksha Vyas, a neurologist and pain management specialist, examined Mackerl for her complaints of dizziness, loss of balance, a stiff neck, dragging left foot, and lower back pain. (Tr. 221) Dr. Vyas observed that Mackerl had a wide-based gait, could not walk on her heels and toes, and had impaired ability to walk in tandem. (Tr. 221) Her strength was 4/5 in the quadriceps, hamstring, and the foot muscles and 5/5 in the right upper extremity and left upper and lower extremities. (Tr. 221) Following her initial consultation, Dr. Vyas diagnosed Mackerl with ataxia, dizziness, and muscle spasms. (Tr. 221) On November 23, 2002, Mackerl had a follow up visit with Dr. Vyas, where Mackerl reported pressure-like symptoms in her left forehead, neck stiffness, and numbness in both hands. (Tr. 228) However, an MRI of Mackerl's brain was within normal limits, except for left maxillary sinusitis. (Tr. 228) Dr. Vyas diagnosed Mackerl with cervical neck stiffness with radicular pain, directed her to continue Allegra and Ibuprofen, and ordered a cervical spine MRI and EMG of Mackerl's upper extremities. (Tr. 228) The MRI, administered on November 15, 2002, showed two small disc herniations and no spinal stenosis or narrowing, and the November 21, 2002 EMG findings were within normal limits for Mackerl's upper extremities. (Tr. 217-18) On December 10, 2002,

Dr. Vyas referred Mackerl to the Pain Management Clinic for bioelectrical and neuromuscular stimulation and hot pack treatment.  (Tr. 213, 215, 229)

Dr. Vyas continued to treat Mackerl from December 5, 2002 to May 29, 2003.  (Tr. 228-29) On December 5, 2002, Dr. Vyas prescribed Motrin for Mackerl's complaints of stiffness in the neck, pain, and numbness in both hands.  (Tr. 229) On January 21, 2003, Mackerl reported that her neck pain still was present but improved and that she had pain in her left arm.  (Tr. 229) Dr. Vyas also found that Mackerl had 5/5 strength in all her extremities and a normal gait.  (Tr. 229) However, on February 25, 2003, Mackerl reported weakness in her legs and imbalance, causing her to "[stumble] from side to side."  (Tr. 229) Nevertheless, Dr. Vyas found that Mackerl's "[n]eck stiffness was less marked" and that she still had 5/5 strength and a normal gait.  (Tr. 229) On April 22, 2003, Dr. Vyas found that Mackerl had strength of 3/5 in the "distal foot muscles of the left leg" and prescribed Neurontin for pain and numbness in Mackerl's left foot.  (Tr. 229) Finally, on May 29, 2003, Mackerl returned to Dr. Vyas complaining of lower back pain and weakness in her left leg and reporting that she had fallen once.  (Tr. 229) A CT scan of the spine revealed a left foramenal protrusion at L4-L5 and diffuse bulging of the L5-S1 disc.  (Tr. 229) In a June 16, 2003 letter to Mackerl's attorney, Dr. Vyas opined that Mackerl's problems with dizziness and balance resulted from her head injury.  (Tr. 230)

6

During the ALJ hearing on April 25, 2003, Mackerl testified that she constantly was dizzy, which lead to problems with her balance.  (Tr. 39-40) Mackerl stated that she had pain across her back and down into her left arm, as well as weakness in that arm, weakness in her legs, and numbness in her feet for about one year.  (Tr. 40-42) She also testified that her lower back began to hurt a few months before the hearing.  (Tr. 42) She stated that she was taking Neurontin, Xanax, Ibuprofen, and Allegra, all of which made her drowsy.  (Tr. 42-43) She further testified that she could not sit or stand for more than 15 minutes, could not stoop, needed to hold onto the shopping cart to balance herself when grocery shopping, could not walk more than half a block, and napped for half an hour three times a day.  (Tr. 43-51) In addition, she said that her left hand was stiff, that it was hard to lift or hold anything in that hand, and that raising her arms in front of her gave her a pulling sensation in he right shoulder.  (Tr. 49-50) She thought she probably could carry about five pounds.  (Tr. 51) Mackerl stated that she had no problem seeing, hearing, or speaking, but she did have problems concentrating more than 10 or 15 minutes.  (Tr. 52)

Following Mackerl's testimony, ALJ Wilkin posed four hypotheticals to VE Peters.  (Tr. 60-64) In response to the first hypothetical, VE Peters testified that if Mackerl had a high school education, was limited to light work away from heights and moving machinery, and had to change position at will, she could perform 2,500 hand packing jobs, 3,500 general office clerk

7

positions, and 2,500 assembly positions. (Tr. 60) In response to the second hypothetical for sedentary work with the same restrictions, VE Peters testified that Mackerl could perform 1,000 telemarketing jobs, 1,200 security monitoring jobs, and 1,500 assembly jobs. (Tr. 61) In a third hypothetical for light or sedentary work in which Mackerl could not sustain eight hours of work, VE Peters testified that Mackerl would be precluded from full time employment. (Tr. 61-62) Finally, VE Peters stated that under hypothetical 2, Mackerl could perform the telemarketing and surveillance jobs from a seated position without change of position. (Tr. 62)

On cross-examination, VE Peters testified that if Mackerl had to take naps during the day, she would be precluded from all work; if Mackerl had slurred speech, she would be unable to perform the telemarketing jobs; if she were unable to use one of her hands on a continuous basis, she would be unable to perform the assembly job at the light and sedentary level; if she were unable to concentrate longer than 30 minutes, she would be unable to perform the security monitoring job; and if dizziness interfered with her essential job tasks, she would be unable to office work. (Tr. 64-66)

In his decision denying disability benefits at Step 5, ALJ Wilkin considered Mackerl's facial injuries and response to surgery, as well as the CT scan showing resolution of her hematoma one month after surgery. (Tr. 15) The ALJ also enumerated the instances in which Mackerl complained of headaches and

8

dizziness to Drs. Spotwood, Zeitoun, Pirtle, and Vyas.  (Tr. 15) However, he noted that an August 2001 CT scan of the head, as well as October 2001 and November 2002 MRIs of the brain, all appeared normal except for signs of sinusitis.  (Tr. 15) ALJ Wilkin also recounted Mackerl's treatment by Drs. Spotwood and Vyas, including Dr. Vyas' findings on Mackerl's physical strength and reflexes and initial impressions of "ataxia, dizziness, muscle spasms, low back pain, status post head and facial injuries, sinusitis and rule out demyelinating disease."  (Tr. 15) He further considered the results of the MRI of Mackerl's cervical spine and the EMG of her upper extremities, which Dr. Vyas ordered, and Dr. Vyas' conclusions on those tests.  ALJ Wilkin stated that Mackerl did not meet the criteria for any listed impairments because:

> Specifically, with normal MRI and EEG/BAER studies, there is not evidence of permanent brain damage from the claimant's injuries, or a demyelinating disease process.  Also per the results of Dr. Vyas' multiple neurological examinations, the claimant retains near normal strength in the lower extremities and usually ambulates with a normal gain.  In addition, the EMG study of the upper extremities was normal in December 2002, and her cervical disc herniation is described as small.  Accordingly, there are no indications that the claimant cannot walk, or perform fine and gross manipulations effectively enough to perform normal activities of daily living. (Tr. 16)

Proceeding to Mackerl's residual functional capacity (RFC), ALJ Wilkin found that Mackerl's testimony on her limitations was only partially credible.  (Tr. 16) He considered her statements

9

that she felt weak and imbalanced most of the time, that her neck bothered her, that she had significant back pain and numbness in her legs, that her left hand was stiff and weak, and that she could sit and stand for no more than 15 minutes, lift/carry five pounds at most, and only concentrate for 15 minutes.  (Tr. 16) However, he also noted that despite the "significant exertional limitations secondary to her neck, back, and upper and lower extremities" that Mackerl reported, x-ray and CT scans showed only some degenerative disc disease, Dr. Zeitoun's evaluation was negative, and Dr. Vyas' diagnostic testing was negative except for a slightly reduced strength of 4/5 in her left leg muscles and tenderness in the lumbosacral area.  (Tr. 17) Therefore, the ALJ concluded that Mackerl exaggerated her pain and physical limitations to "some extent."  (Tr. 17)

ALJ Wilkin further noted that despite Mackerl's consistent complaints of dizziness and balance problems, her surgery went well, she did not require follow-up treatment, and she returned to work for over one year following her head trauma.  (Tr. 17) He then concluded that Mackerl may have been pushing herself too hard by trying to work as a cook, a job that required her to stand and walk constantly and lift as much as 50 pounds, but that she was not precluded from doing all work activity.  (Tr. 17) Rather, he found that Mackerl could lift up to 10 pounds, occasionally carry small items, and occasionally stand and walk, but that she could not work around heights and machinery and needed to change positions freely.  (Tr. 17) In so holding, the ALJ

10

explicitly rejected the opinions of State agency consultants, who concluded that Mackerl's impairments were non-severe. (Tr. 17) Rather, he found that although her impairments were severe, Mackerl still retained an RFC to perform 1,000 telemarketing jobs, 1,200 jobs as a security systems monitor, and 1,500 jobs as an assembler, as stated in the second hypothetical the ALJ posed to VE Peters.

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. ß405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v.*

***Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  ***Lopez***, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. ß423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R.  ß404.1520, ß416.920.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. ß404.1520(b), ß416.920(b).  If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. ß404.1520(c), ß416.920(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. ß401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the

12

impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work.  If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. §404.1520(e), §416.920(e).  However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.   42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f), §416.920(f).

   Mackerl's first argument in support of remand is that the ALJ's determination is erroneous because he "ignores the opinion of Dr. Vyas" and fails to defer to Dr. Vyas' opinion or to weigh the opinion's value under the factors of 20 C.F.R. §404.1527(d). (*See* Pl. Open. Br. p. 8) An ALJ must give controlling weight to a treating physician if the opinion is (1) "well supported by medically acceptable, clinically and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence in the case record."  20 C.F.R. §404.1527(d)(2).  *See also* SSR 96-2p; **Boiles v. Barnhart**, 395 F.3d 421, 426 (7th Cir. 2005); **Gudgel v. Barnhart**, 345 F.3d 467, 470 (7th Cir. 2003).  If the treating physician's opinion is not entitled to controlling

13

weight, the ALJ will determine the weight to give the opinion based on

> the length, frequency, nature and extent of the treatment relationship; the degree to which the medical signs and laboratory findings support the opinion; the consistency of the opinion with the record as a whole; and the specialization of the physician.
>
> ***Smith v. Apfel***, 231 F.3d 433, 440 (7th Cir. 2000)

*See also* 20 C.F.R. ß404.1527(d)(2), (3), (4).  An ALJ may reject a treating physician's opinion that is supported only by the claimant's subjective complaints.  ***Smith***, 231 F.3d at 440; ***Dumler v. Barnhart***, 114 Fed. Appx. 212, 214 (7th Cir. 2004).

Because ALJ Wilkin accepted Dr. Vyas' opinion in full, the court rejects Mackerl's argument that the ALJ unfairly discounted the physician's opinions.  First, in finding that Mackerl had a severe impairment "by reason of status post head trauma with residuals affecting balance, and degenerative disc disease of the cervical and lumbosacral spines," the ALJ explicitly accepted Dr. Vyas' opinion that Mackerl's problems with dizziness and balance originated from her head injuries.  (Tr. 15-16) Second, ALJ Wilkin detailed Dr. Vyas' treatment of Mackerl and considered Dr. Vyas' initial impressions that Mackerl had ataxia, dizziness, muscle spasms, low back pain, sinusitis, but no demyelization disease.  (Tr. 15) The ALJ also noted that several tests administered under Dr. Vyas' care were all normal, but that an MRI of the cervical spine revealed a small disc herniation at C4-5 and bulging disc at C5-6 and a CT scan revealed a left foramenal

14

protrusion at L4-5 and diffuse bulging at L5-S1.  (Tr. 15) Third, the ALJ appears to have based his RFC assessment on Dr. Vyas' impressions and findings.  (Tr. 16-17) He noted that Mackerl's impairments did not meet or equal a listed impairment based specifically on Dr. Vyas' negative test results and noted that throughout Dr. Vyas' examinations of Mackerl, she retained near normal strength and ambulated with a normal gait.  (Tr. 16) Finally, in determining Mackerl's RFC, the ALJ restricted work around moving machinery or heights due to Mackerl's dizziness and poor balance.  (Tr. 17) In light of ALJ Wilkin's detailed and complete reliance on Dr. Vyas' opinion, this court cannot find that the ALJ ignored Mackerl's treating physician or was "playing doctor," as Mackerl suggests.

Mackerl's second argument, that the ALJ failed to evaluate her credibility properly, and third argument, that the substantial evidence did not support the ALJ's credibility determination, essentially are the same.  Thus, the court will consider these arguments together as a challenge to the ALJ's credibility determination.  However, the court must clarify its approach to this issue before reaching the substance of it.

Mackerl's opening brief contains only one short paragraph on her credibility argument with citation to one case and no application of the law.  Likewise, Mackerl's "substantial evidence" argument briefly references one Social Security Ruling and a secondary source, with no reference to case law.  Then, Mackerl devotes the entirety of her reply brief to the ALJ's credibility

15

determination, although she does so with virtually no citation to law beyond a few passing references to Social Security Rulings. Furthermore, Mackerl raises a number of challenges to the ALJ's credibility determination in her reply brief that she does not raise in her opening brief, including (1) that the ALJ failed to consider Mackerl's statements that repetitive motion in her arms increases her pain and failed to incorporate this assertion into the hypotheticals presented to the VE, (2) that the ALJ erred in accepting the VE's statements regarding the "security monitor" job without inquiring whether the job was consistent with the DOT, and (3) that the hypothetical on which the ALJ relief to reach Mackerl's RFC was flawed.  Once again, Mackerl raises these new arguments without any legal support.

While Mackerl need not present a dissertation on each issue, she nevertheless must present all of her challenges in her opening brief so that the Commissioner has a fair opportunity to respond, and she must adequately support her arguments.  Thus, the arguments Mackerl raises for the first time in her reply brief are waived.  *See* **Pugel v. Board of Trustees of the University of Illinois**, 378 F.3d 659, 669 (7th Cir. 2004) (*quoting* **James v. Sheahan**, 137 F.3d 1003, 1008 (7th Cir. 1998)); **AT&T Wireless PCS, Inc. v. Town of Porter**, 203 F.Supp.2d 985, 989 (N.D. Ind. 2002).  Furthermore, the Seventh Circuit has recognized that courts need not and indeed should not expend limited judicial resources in researching, refining, and otherwise fleshing out arguments the parties themselves do not adequately

16

support.  *See* **Tyler v. Runyon**, 70 F.3d 458, 464-65 (7th Cir. 1995); **Hershinow v. Bonamarte**, 735 F.2d 264, 266 (7th Cir. 1984) (refusing to consider an argument that was briefed in a "perfunctory and undeveloped [] manner").  Therefore, the court considers Mackerl's credibility challenge only under the general terms of her opening brief.

The ALJ must determine Mackerl's credibility after considering all of her symptoms "and the extend to which [her] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. ß404.1529(a). If Mackerl's impairments reasonably could produce the symptoms of which she is complaining, the ALJ next must evaluate the intensity and persistence of the symptoms through consideration of her "medical history, the medical signs and laboratory findings, and statements from [her] treating or examining physician or psychologist, or other persons about how [her] symptoms affect [her]." 20 C.F.R. ß404.1529(c)(1).  If the symptoms Mackerl described are not supported by the objective medical evidence, "the ALJ must obtain detailed descriptions of [Mackerl's] daily activities by directing specific inquiries" about her symptoms and their effect on her.  However, the ALJ "need not totally accept or totally reject [Mackerl's] statements."  SSR 96-7p at *4.  Rather, the ALJ can make a determination, based on the totality of the evidence, that Mackerl's statements are credible only to a certain degree.  *See* SSR 96-7p at *4.

17

While Mackerl's complaints of disability cannot be based on symptoms totally unfounded in medical findings, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence."  SSR 96-7p at *1.  *See also* **Carradine v. Barnhart**, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."); **Indoranto v. Barnhart**, 374 F.3d 470, 474 (7th Cir. 2004).  In addition, the ALJ must make more than "a single, conclusory statement . . .  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.  SSR 96-7p at *2.  *See also* **Zurawski v. Halter**, 245 F.3d 881, 887 (7th Cir. 2001) The ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion."  **Zurawski**, 245 F.3d at 887 (*quoting* **Clifford**, 227 F.3d at 872).

The court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record.  **Jens v. Barnhart**, 347 F.3d 209, 213 (7th Cir. 2003); **Powers v. Apfel**, 207 F.3d 431, 435 (7th Cir. 2000).  Furthermore, the ALJ's "unique position to observe a witness" entitles his opinion to great deference.  **Nelson v. Apfel**, 131 F.3d 1228, 1237 (7th Cir. 1997).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review,"

18

the ALJ's credibility determination is not entitled to deference. ***Steele v. Barnhart***, 290 F.3d 936, 942 (7th Cir. 2002).

ALJ Wilkin's credibility determination builds the requisite logical bridge between the evidence and his conclusion and complies with SSR 96-7p.  Contrary to Mackerl's assertion that the ALJ made only a conclusory statement, the ALJ's decision reveals that he considered her testimony that she felt weak and imbalanced, that her back and neck caused her pain, that her left hand was stiff and weak, that she had limited ability to sit, stand, or lift, and that her medications made her drowsy.  (Tr. 16) The ALJ then considered Mackerl's statements against the results of Mackerl's x-rays, CT scans, MRIs, and strength tests, all of which consistently provided negative results except for a showing of some degenerative disc disease and a slightly reduced strength of 4/5 in her left leg muscle with tenderness in the lumbosacral area.  (Tr. 17) Furthermore, the court notes that outside of Mackerl's testimony at the hearing, the record is absent of any reports by a physician, or by Mackerl herself, that her medications made her drowsy, that her neck, back, or arm pain interfered with her arm and hand strength or ability to manipulate her hands in any way, or that she was as severely limited in her ability to walk as she testified.  Finally, the ALJ did not base his opinion entirely upon objective medical evidence. Although the ALJ found that Mackerl's subjective complaints were not as severe as she claimed, he accepted that Mackerl did experience some dizziness and balance problems and adjusted her

19

RFC accordingly.  (Tr. 16-17) Given the absence of medical support or even prior consistent complaints by Mackerl for her claimed limitations, the ALJ was fully reasonable in concluding that Mackerl exaggerated her pain and physical limitations to "some extent."  (Tr. 17) Therefore, the court will not set aside the ALJ's credibility determination.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the plaintiff, Loretta Mackerl, on December 22, 2003 is **DENIED**.

ENTERED this 10th day of June, 2005

                                 s/ ANDREW P. RODOVICH
                                    United States Magistrate Judge